U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 DEC -9 PM 3:43

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:23-cr-00119-1 |
| ) | |
| BAYOHAN MANGUAL ) | |

# ENTRY ORDER
# GRANTING MOTION FOR AN ORDER AUTHORIZING CONSUMPTIVE DNA TESTING
(Docs. 46 & 48)

On September 27, 2024, the government filed a motion for an order authorizing agents of Bode Technology or another laboratory jointly agreed upon by the parties to conduct consumptive DNA testing of a sweatshirt and fingernail clippings, which were seized as evidence in the government's case against Defendant Bayohan Mangual. On October 11, 2024, Defendant opposed the motion because "the evidence in question has been tested and is exculpatory and because the government has offered an inadequate explanation for the recommendation provided by its expert." (Doc. 47 at 1.) The government filed its reply on October 25, 2024.

Also on October 25, 2024, the government filed a second motion for an Order authorizing DNA testing of thirteen spent shell casings recovered from the scene of the underlying event. On November 8, 2024, Defendant filed his opposition, and on November 22, 2024, the government filed a reply.

Defendant is represented by Federal Public Defender Michael L. Desautels and Assistant Federal Public Defenders Barclay T. Johnson and Sara M. Puls. The government is represented by Assistant United States Attorneys Jonathan Ophardt and Nicole P. Cate.

**I.      Factual Background.**

The following facts are derived from the government's motions. On September 2, 2023, officers from the Rutland City Police Department (the "RCPD") responded to 50

Cherry Street, Apartment 2, in Rutland, Vermont, which was a small, second-floor apartment with one bedroom. Outside the residence, officers found a male, D.H., who had been shot. Inside the bedroom, officers found a deceased male, later identified as Santonieo Miller, who had also been shot. While searching the apartment pursuant to a state search warrant, officers recovered, among other items, thirteen spent 9-millimeter shell casings and a firearm near Mr. Miller's body. Subsequent forensic testing indicated that Mr. Miller did not discharge any rounds from that weapon.

Citing witness statements and forensic firearm analysis, the government contends that, after Mr. Miller and D.H. entered the apartment, Defendant discharged all of the expended rounds, hitting both Mr. Miller and D.H. According to the government, Defendant then exited the apartment and traveled to Connecticut.

The Vermont Office of the Chief Medical Examiner performed an autopsy of Mr. Miller's body and, among other things, swabbed his hands and took fingernail clippings. On October 18, 2023, a federal grand jury returned an Indictment charging Defendant with being a felon in possession of ammunition on September 2, 2023. An arrest warrant was issued in connection with the Indictment. On November 10, 2023, Homeland Security Investigations ("HSI") obtained a search warrant for Defendant's residence, which was executed on November 17, 2023.

Among the items recovered during the search of Defendant's residence were a white hoodie-style shirt or sweatshirt in Defendant's and his girlfriend's bedroom. The hoodie was consistent with a shirt worn by a male running from the area of 50 Cherry Street shortly after the shooting as depicted in a surveillance video. Officers also recovered a Glock 43 9-millimeter firearm box from Defendant's bedroom and an AR-style rifle and two handguns from a pink shed in the backyard.

On January 12, 2024, HSI obtained a search warrant to obtain DNA buccal swabs from Defendant. The warrant was executed on January 22, 2024. The government also obtained DNA samples from other individuals related to its investigation, including Mr. Miller and D.H.

The Vermont Forensic Laboratory ("VFL") generated DNA profiles for each of

the individuals from whom the government obtained DNA samples. The VFL conducted serology testing on the sweatshirt recovered from Defendant's bedroom, which was presumptively positive for blood. The VFL then obtained a limited DNA profile from a piece of fabric from the sweatshirt's left sleeve and identified the presence of male DNA. Due to the limited amount of genetic material available, the VFL determined that the DNA obtained from the fabric was not suitable for further interpretation. The VFL did not analyze the fingernail clippings for DNA.

The government subsequently engaged Bode Technology to analyze the evidence for DNA. Among the items the government submitted to Bode were the white sweatshirt and fabric cutting, Mr. Miller's fingernail clippings (obtained during his autopsy), swabs of Mr. Miller's hands, and the known DNA profiles generated by VFL for individuals associated with the investigation. The swabs from Mr. Miller's hands each contained a mixture of DNA from four or more individuals, including Mr. Miller. Bode Technology did not analyze the fingernail clippings for DNA.

After reviewing the evidence, the Bode DNA analyst assigned to oversee the processing of the evidence identified two areas of staining on the sweatshirt fabric and recommended combining and consuming the stains to provide the best opportunity for developing a usable profile. The analyst further recommended combining the fingernail clippings from Mr. Miller's hands and consuming all of the genetic material on them to provide the best opportunity for developing a usable profile due to the small size of these items. The government advised Bode not to proceed with the recommended consumptive testing pending consultation with defense counsel and the court.

On July 26, 2024, the government notified Defendant's counsel of Bode Technology's recommendation for consumptive testing of the sweatshirt fabric. On August 19, 2024, it notified Defendant's counsel of its recommendation for consumptive testing of the fingernail clippings. On July 30, 2024, Defendant's counsel objected to any testing that would result in the complete destruction of the evidence. On September 4, 2024, the government asked Defendant to consent to Bode Technology conducting the recommended testing in the presence of an expert of Defendant's choice or, in the

alternative, to consent to a different, third-party laboratory to conduct the testing. On September 19, 2024, the government sent a follow-up message regarding the DNA testing and informed Defendant's counsel that, if the parties were not able to come to agreement regarding how to accomplish the DNA analysis, the government would file a motion on September 27, 2024. No response was forthcoming.

With regard to the recovered shell casings, the government notified defense counsel on October 16, 2024, of its intent to submit the thirteen shell casings to Bode for DNA analysis and noted that the planned testing would be consumptive. The government requested a response from Defendant's counsel by October 23, 2024, but it did not receive a response prior to filing its second motion for DNA testing. In its reply, the government advised it does not plan to combine the shell casings for testing.

## II.    Legal Conclusions and Analysis.

The government seeks to have Bode Technology analyze two additional areas of fabric from the sweatshirt that were not previously analyzed by the VFL. It also seeks to have Bode Technology analyze the fingernail clippings because they have not been analyzed yet, any DNA recovered from Mr. Miller's fingernail clippings "has obvious evidentiary value, regardless of the result of the hand swab analysis[,]" and "the results of the hand swab analysis—that the DNA of at least four individuals was present, but only one individual was able to be identified—strengthens the argument that the fingernail clippings should also be analyzed." (Doc. 49 at 2-3.) Finally, the government seeks to have the shell casings tested for DNA by a "technique [which] entails processing the casings by using a rinse on the entirety of the casings." (Doc. 50 at 2 n.1) (internal quotation marks omitted).

Defendant responds that the evidence is "broadly exculpatory" because Defendant's DNA has not been matched and the absence of his DNA on Mr. Miller's hands as well as the absence of Mr. Miller's DNA on the sweatshirt "is evidence that has some tendency to establish [Defendant's] innocence." (Doc. 47 at 3.) Defendant further argues that the government has not explained its recommendation to proceed with testing that would consume the fabric and fingernails, whether alternatives exist, and "whether

4

there is any realistic probability that the testing will do anything other than simply consume the samples without any meaningful results." *Id.* He contends that the shell casings "were made up of several different brands of ammunition, a fact that detracts from any conclusion that the shells all came from the same firearm[,]" that they were recovered from four different locations, and that "the government's plan is to combine all the shells and test for the presence of DNA broadly on the shells as a group." (Doc. 50 at 2.) The government agrees that "the thirteen recovered shell casings should not be combined before testing for DNA[,]" and clarifies its request for the "authority to analyze each of the thirteen recovered shell casings *individually* for DNA." (Doc. 54 at 1) (emphasis in original).

The Due Process Clause affords criminal defendants significant procedural safeguards that protect the defendant's opportunity to present a complete defense. *See, e.g., California v. Trombetta*, 467 U.S. 479 (1984). Courts have repeatedly decided, however, that consumptive DNA testing does not violate a defendant's rights where: (1) the potential DNA evidence has no apparent exculpatory value, (2) the defendant can still challenge the testing in other ways, and (3) the government is acting in good faith. *See United States v. Al Mosaadi*, 2020 WL 6809259, at *8-9 (W.D.N.Y. Aug. 10, 2020) (considering whether government destroyed evidence in bad faith and "whether the evidence itself is of such a nature that the defendant would not be able to obtain comparable evidence by other reasonably available means"); *United States v. Gardner*, 2015 WL 1951809, at *2 (E.D.N.C. Apr. 29, 2015) ("When determining bad faith, the court considers what the government or its agents knew regarding the exculpatory value of the evidence at the time it was lost or destroyed.").

Exculpatory evidence for consumptive testing is evidence that is "material," and which "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489; *see also United States v. Greenberg*, 835 F.3d 295, 303 (2d Cir. 2016) (quoting *Trombetta*); *United States v. Barnes*, 411 F. App'x 365, 368-69 (2d Cir. 2011) (summary

5

order) (finding defendant failed to satisfy two-pronged *Trombetta* test and affirming conviction where DNA evidence was admitted at trial and government lost evidence before defendant could conduct analysis).[1]

If the evidence is not "material," "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). "Therefore, a key distinction is made between evidence which possesses exculpatory value and evidence which only possesses potentially exculpatory value." *Gardner*, 2015 WL 1951809, at *2 (citing *Trombetta*, 467 U.S. at 488-89; *Youngblood*, 488 U.S. at 57-58). The evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976). "[I]nformation is not exculpatory merely because it is not affirmatively incriminating." *United States v. Wilson*, 2017 WL 1456984, at *4 (W.D.N.Y. Apr. 25, 2017) (citing *United States v. Scarpa*, 913 F.2d 993, 1010-11 (2d Cir. 1990)).

In this case, the government seeks DNA testing of items which have not yet been tested and whose evidentiary value, if any, is unknown. Although the VFL previously tested a piece of fabric from the left sleeve of the sweatshirt, it seeks to have Bode analyze two different areas of fabric from the sleeve. This would apparently leave other parts of the fabric intact and thus would not be fully destructive.

Neither the VFL nor Bode has tested Mr. Miller's fingernail clippings or the shell

---

[1] *See also United States v. Gamble*, 697 F. Supp. 3d 1045, 1056 (D. Nev. 2023) (concluding exculpatory nature of DNA test on defendant's rifle was not apparent where "at best, [a] favorable result only 'could have' exculpated" defendant, "[b]ut even that would merely mean that [defendant] didn't leave DNA on the rifle, not that he never possessed it[,]" and finding defendant's DNA "would have further incriminated him"); *United States v. Ausby*, 2019 WL 3718942, at *4 (D.D.C. Aug. 7, 2019) ("Indeed, if no more can be said about the evidence than that it could have been subjected to tests, the results of which might have exonerated the defendant, there is no denial of due process unless a criminal defendant can demonstrate the [g]overnment's bad faith.") (internal quotation marks omitted); *United States v. Williams*, 2008 WL 5382264, at *4 (C.D. Cal. Dec. 23, 2008) (holding defendant did not "carry his burden to show that the destroyed evidence had an 'apparent' exculpatory value before it was destroyed" because "not knowing who the hairs came from, the [g]overnment could not have known that the evidence would exculpate [d]efendant").

6

casings. Any DNA recovered from the fingernail clippings of Mr. Miller may have evidentiary value in light of the fact that the hand swab analysis indicated the DNA of at least four individuals was present. There is, however, no evidence that Mr. Miller had physical contact with his assailant or assailants before he was shot. It is thus unclear whether the fingernail clippings will have any evidentiary value for either party.

Testing the shell casings may have evidentiary value based on where the casings were found and who may have loaded them into the weapons.

Against the foregoing backdrop, any DNA evidence recovered from testing the items in question has, at best, potentially exculpatory value. With respect to the sweatshirt, if the DNA is determined to belong to Mr. Miller or D.H., the evidence would inculpate Defendant. If the DNA on the two additional locations of the sleeve match Defendant or someone else, that result would not exonerate Defendant of the shootings. Although testing of Mr. Miller's fingernails and the shell casings could potentially provide exculpatory or inculpatory results, without first completing the testing, their evidentiary potential is unknown. Collectively, there is no evidence that the items sought to be tested have any apparent exculpatory value.

As to the second *Trombetta* factor, Defendant may cross-examine the government's DNA analyst, call a defense DNA expert to testify about shortcomings in the government's testing or results, and compare a defense-generated DNA profile of Defendant to any DNA profiles created from the testing of the sweatshirt, fingernail clippings, or shell casings. Defendant may also request (and be granted) the opportunity to observe the testing and/or select a third-party analyst. These alternatives are consistent with the ABA Standards of DNA Evidence. It is also unclear that there is any other means of further DNA testing of these items rather than consumptive testing. Defendant does not identify any such method and the government has adequately explained its efforts to date.

Because Defendant has "alternative means of demonstrating [his] innocence[,]" *Trombetta*, 467 U.S. at 490, because the evidence in question is, at best, only potentially exculpatory, and because Defendant does not establish that the government is not acting

in good faith, the government's motions for an Order authorizing consumptive DNA testing is hereby GRANTED.[2]

## CONCLUSION

For the foregoing reasons, the government's motions for an Order authorizing consumptive DNA testing is GRANTED. (Docs. 46 & 48.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 9th day of December, 2024.

Christina Reiss, Chief Judge
United States District Court

---

[2] Any testing that occurs must comply with the ABA Standards of DNA Evidence. To the extent testing may be performed on split samples, testing should be performed in that manner. Defendant may request that the testing be performed by a third party or have his expert present during testing, by filing that request with the government and the court within ten (10) business days of this Entry Order.